UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANA JUNEJA, et al.,

Plaintiffs,

-against-

ASSOCIATION OF NATIONAL ADVERTISERS, INC.

Defendant.

25-CV-9433 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are a Motion to Dismiss and Strike by Defendant Association of National Advertisers, Inc., (Dkt. 20), along with Defendant's accompanying Request for Judicial Notice of certain materials in support of the aforementioned Motion. (Dkt. 22.) For the following reasons, Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Defendant's Motion to Strike is DENIED without prejudice.

## I. BACKGROUND

The following factual background is drawn from Plaintiffs' complaint ("the Complaint"). (Dkt. 1.)

### A. Plaintiff's Business Enterprises

Plaintiff Ana Juneja ("Plaintiff" or "Juneja") is an attorney, legal educator, and social media creator domiciled in Washington, D.C. (Dkt. 1 ¶ 10.) She is the sole member of

additional plaintiffs Ana Law LLC, AnaGPT LLC, and Ana IP Holdings LLC. (Id.)

In June 2022, Juneja launched her firm ("the Firm"), branding it as "ANA Law." (Dkt. 1 ¶ 16.) The Firm is now a full-service intellectual property law firm and serves clients throughout the United States and abroad. (Id.)

Juneja's enterprises also extend into online legal education via social media. As part of this, Juneja posts short-form education content covering various legal topics (including intellectual property law), targeted at a non-legal audience, under the usernames "Ana Juneja" and "Ana Law." (Dkt. 1 ¶ 20.) Juneja has more than 300,000 followers across her social media platforms. (Id.) Juneja's social media business generates revenue and clients for the Firm, directing followers to legal tools, consultations, and educational partnerships also under the "ANA Law" mark. (Id. ¶¶ 22, 35, 71.)

In addition to her educational content on social media, which is targeted at a non-legal audience, Juneja has provided continuing legal education ("CLE") services since 2022 through AnaGPT LLC. (Dkt. 1 ¶ 23.) AnaGPT's CLE programming includes "trademark infringement, the legal mechanics of branding, social media compliance, digital marketing, and advertising regulations." (Id.) Juneja "has served as a recurring CLE instructor for . . . [the] National Business Institute (NBI), myLawCLE, and various

state bar associations." (Id.) To facilitate marketing and branding efforts in conjunction with Juneja's CLE programs, Juneja has, through AnaGPT LLC, licensed use of some "ANA"-related trademarks to various third-party CLE providers. (Id. ¶ 35.)

Moreover, Juneja (through Ana IP Holdings) owns a number of registered trademarks related to her first name, (See Dkt. 1 ¶ 35), most notably "ANA" (U.S. Reg. No. 7197737), "ANA Law" (U.S. Reg. No. 6757972), and Juneja's firm logo (U.S. Reg. No. 6758019). (Id.) "ANA Law" and the ANA Law logo were registered on June 14, 2022, while the "ANA" mark was registered on October 17, 2023. Juneja uses these marks across her legal, educational, and social media business, promoting them through "firm communications, online platforms, social media content, media appearances, and speaking engagements. (Id. ¶ 36.)

**B. Defendant's Rebranding Efforts**

Defendant Association of National Advertisers, Inc. ("Defendant" or "the Association") is a New York corporation. (Dkt. 1 ¶ 14). Founded in 1910 as an advertising and marketing industry trade association, Defendant's "activities include hosting conferences, networking events, and educational programs for advertising and marketing professionals," including legal conferences. (Id.)

Defendant has hosted an annual conference on marketing and advertising law for decades. (Id. ¶ 40.) Before 2022, Defendant

held this conference under titles such as "Advertising Law & Public Policy Conference," "Marketing Law Conference," and "ANA/BAA Marketing Law Conference," using "ANA" to denote the host organization's name. (Id. ¶ 42.) In 2022, Defendant rebranded its conference to the "ANA Masters of Advertising Law," (Id. ¶ 41), and promoted this new branding across various digital channels. (Id. ¶ 44.) Hosted from November 8–10, 2022, Defendant's 2022 conference ("the Conference") covered "topics including Web3, loyalty program regulation, AI-driven marketing trends, and other issues in advertising and marketing law." (Id. ¶ 41.)

Since the rebranding, Defendant has also begun hosting new events under the name "ANA Law 1-Day Conference," covering topics including generative AI and retail marketing law. (Dkt. 1 ¶ 45.) To promote its legal events on social media, Defendant uses the hashtag "#ANALaw," (Id. ¶ 46), which Juneja also uses to promote her intellectual property and business law content. (Id. ¶ 55.)

Defendant has a trademark in "ANA," issued on August 29, 2006, with claimed first use in 1911. On March 3, 2022, Defendant filed an application to register "ANA Masters of Advertising Law" as a trademark; the application was published for opposition on May 2, 2023. (Dkt. 1 ¶ 59.) Juneja opposed the mark's registration on July 1. (Id. ¶ 60, 62.) As Defendant failed entirely to respond to Juneja's discovery requests (Id. ¶ 64) or oppose her motion for summary judgment (Id. ¶ 67), the Trademark Trials and Appeals Board

(TTAB) granted Juneja's motion for summary judgment and denied Defendant's application. (Id.)[1]

### C. Defendant's AI Conference App Claims

In connection with its "ANA Masters of Advertising Law" conference, Defendant provided a digital event platform ("the App") to attendees. (Dkt. 1 ¶ 73.) In some of the marketing materials for the App, Defendant made the claim that the App was "[t]he leading AI-powered event app." (See Dkt. 1-5 at 43 (Exhibit M).) Juneja alleges "upon information and belief" that the App "is a private-label event-management portal supplied by a third-party vendor that offers only standard scheduling and messaging functions, with no disclosed or demonstrable artificial-intelligence capabilities." (Dkt. 1 ¶ 74.)

### D. Defendant's Alleged Unlicensed Use of Female Content Creator's Online Content

Since 2016, Defendant has operated the "SeeHer" Initiative ("SeeHer"), a program which "purports to 'eliminate gender bias across the industry' and to promote the accurate portrayal of women and girls in advertising, entertainment, and branded content."

---

[1] Plaintiff repeatedly emphasizes that admissions Plaintiff requested were deemed admitted in the TTAB proceeding because of Defendant's failure to respond. (Dkt. 1 ¶ 65.) However, Rule 36(b) of the Federal Rules of Civil Procedure makes clear that "An admission under [Rule 36] is not an admission for any other purpose and cannot be used against the party in any other proceeding." FED. R. CIV. P. 36(b). Accordingly, the TTAB default admissions are not relevant to this matter.

(Dkt. 1 ¶ 78.) Juneja alleges that, in 2025, "SeeHer's Instagram and TikTok accounts reposted hundreds of short-form videos created by independent female creators," not by using the social media platforms' built-in "repost" functions (which preserve attribution), but instead by manually downloading and reuploading the videos "without consent, contract, license, or notice." (Id. ¶ 80.) On July 1, 2025, Juneja sent messages to more than 200 of the original creators, notifying them of their videos' presence on Defendant's SeeHer social media pages. (Id. ¶ 81.) The next day, SeeHer's Instagram was taken offline, which Juneja alleges "upon information and belief" was a "direct response to Plaintiff's outreach and anticipated legal exposure." (Id. ¶ 82.) About two days later, SeeHer's Instagram account reappeared, but without the videos Juneja alleges were reposted without authorization. (Id. ¶ 83.)

**E. Defendant's Judicial Notice Materials**

In its Request for Judicial Notice in Support of Its Motion to Dismiss and Strike ("the Request"), Defendant asks the Court to take judicial notice of twenty-one exhibits. (Dkt. 22 at ECF 2-3.) The exhibits are split essentially into two groups: the first eighteen exhibits are materials related to Plaintiffs' trademark applications and registrations (see id.), while the final three exhibits are screenshots of the App's store page on the Apple App (Dkt. 22-19 (Exhibit 19)) and Google Play (Dkt. 22-20 (Exhibit

20)) stores and a pair of screenshots of the App's login page (Dkt. 22-21 (Exhibit 21).)

## II. REQUEST FOR JUDICIAL NOTICE

As an initial matter, the Court addresses the Request so it can determine whether to take judicial notice of the exhibits attached to the Request when deciding Defendant's other Motions.

Under Federal Rule of Evidence 201(b)(2), the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." F. R. EVID. 201(b)(2). This includes "official records of the United States Patent and Trademark Office." Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 345 (S.D.N.Y. 2014). Accordingly, the Court takes judicial notice of Exhibits 1-18 because they are publicly available USPTO records relating to the trademark applications and registrations referenced in the Complaint. (Dkt. 22 at ECF 5.)

The App exhibits raise a more complex question. "Where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a motion to dismiss] where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted). This includes information publicly available on a website, "as long as the website's authenticity is not in dispute

and 'it is capable of accurate and ready determination.'" Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (citations omitted). An "integral" matter is usually "a contract, agreement, or other document essential to the litigation." Palin v. New York Times Co., 940 F.3d 804, 811 (2d Cir. 2019) (emphasis added). On a motion to dismiss, the Court may consider such documents "'only to determine what the documents stated' and 'not to prove the truth of their contents.'" Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original) (citation omitted).

As the authenticity of the app store listings (Exhibits 19 and 20) and the screenshot of the App (Exhibit 21) are not in dispute here, whether the Court may take judicial notice of Exhibits 19–21 depends on whether the exhibits are "integral" to the Complaint. They are not.

Exhibits 19 and 20 appear to be offered by Defendant to refute Plaintiffs' allegation that "[u]pon information and belief, Defendant's mobile event platform is not available through any public app marketplace top app listing, including the Apple App Store or Google Play Store." (Dkt. 1 ¶ 74.) While the allegation of the App's unavailability on app stores might support the idea that would-be customers are made to register for one of Defendant's conferences to access the App, the allegation is not "integral" to Plaintiffs' false advertising claim, which centers on claims

Plaintiffs allege Defendant made on Defendant's website, (see Dkt. 1-5 at ECF 43 (Exhibit M)). Further, the point Defendant seeks to support with Exhibit 21—that "[t]he only individuals who can make use of the application are those already registered for an ANA conference" (Dkt. 21 at ECF 25)—has no bearing on Plaintiffs' claims surrounding the App. Plaintiffs' claim is that Defendant's statements concerning the App "could plausibly influence a consumer's decision to attend a conference in order to access or evaluate the app" (dkt. 25 at ECF 25), not that a person not registered for one of Defendant's conferences might download the app to evaluate Defendant's AI claims. Because Exhibits 19-21 are not "integral" to the claims put forward in the Complaint, the Court declines to take judicial notice of them.

## III. MOTION TO DISMISS

Having determined which materials to consider when deciding Defendant's Motion to Dismiss, the Court next assesses the sufficiency of Juneja's pleadings as to each of her asserted causes of action.

### A. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts

alleged allow the Court to draw the "reasonable inference that the defendant is liable for the misconduct alleged." Id. Plausibility does not require probability, but "asks for more than a sheer possibility that [the] defendant has acted unlawfully." Id. In assessing the Complaint, the Court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." Sacerdote v. New York Univ., 9 F.4th 95, 106-07 (2d Cir. 2021). However, the Court disregards all conclusory allegations in the Complaint, including but not limited to "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555.

### B. Juneja States a Claim for Trademark Infringement, Unfair Competition, and False Designation under Federal Law and Common Law Trademark and Unfair Competition Under New York Law

Juneja has pled facts sufficient to allege plausibly Federal Trademark Infringement, Unfair Competition, and False Designation and New York common law trademark infringement and unfair competition in her "ANA" and "ANA Law" marks.

#### 1. Assessing Plaintiffs' Numerous Claims Concurrently

The elements of trademark infringement, unfair competition, and false designation of origin are all essentially identical under the Lanham Act. See Hermes Int'l v. Rothschild, 603 F. Supp. 3d 98, 102 (S.D.N.Y. 2022); Richemont N. Am., Inc. v. Huang, No. 12-CV-4443 KBF, 2013 WL 5345814, at *5 n.15 (S.D.N.Y. Sept. 24, 2013).

New York common law trademark infringement and unfair competition also closely parallel the Lanham Act requirements, though the state law unfair competition cause of action also requires "some showing of bad faith" on the defendant's part. Id. (citation omitted). Accordingly, the Court analyzes Plaintiffs' multitudinous trademark-related claims concurrently, addressing the additional bad faith requirement for the state law claims last.

### 2. Ascertaining Which Marks Are at Issue

As an initial matter, Juneja does not clearly state which of her several marks Defendant allegedly infringed. While Juneja provides information regarding eight registered marks and eleven marks pending registration, (see Dkt. 1 ¶¶ 29–33), each of her trademark claims focuses on Defendant's alleged use of "ANA" and "Law" in marketing various law-related events. (See id. ¶¶ 88–89, 91, 95, 98, 107, 109, 113, 115.) Thus, while Juneja appends the phrase "ANA®-formative marks" to many of her allegations throughout the Complaint, the Court reads the Complaint as only making out claims with respect to Juneja's "ANA" and "ANA Law" marks. The Court evaluates the Complaint accordingly. To the extent that the Complaint alleges infringement of the other marks, all such claims are dismissed for failure to state a claim, as the

Complaint fails to allege plausibly any factual basis to support Plaintiffs' claims with respect to those marks.

### 3. Protectability of Plaintiffs' Marks

#### a. Applicable Law

To state a claim for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051 et seq., Juneja must allege plausibly that (1) the mark is valid and protectible; and (2) Defendant's "use in commerce" of the allegedly infringing mark would likely cause confusion as to the origin, sponsorship, or affiliation of Defendant's goods with Juneja's goods. 1-800 Contacts, Inc. v. JAND, Inc., 119 F.4th 234, 241 n. 2, 246 (2d Cir. 2024) (citations omitted); see 15 U.S.C. § 1114(1)(a) (making it illegal to "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive").

"To be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others"—in other words, distinctive. Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999) (citing Two Pesos v. Taco Cabana, 505 U.S. 763, 768 (1992)). Registration on the principal register with the U.S. Patent and Trademark Office (PTO) is prima facie evidence that the mark valid and protectible. Id. at 345;

see also Sulzer Mixpac AG v. A&N Trading Co., 988 F.3d 174, 178 n.2 (2d Cir. 2021) ("Registration on the principal register confers on the mark's holder certain benefits in litigation, including a rebuttable presumption that the mark is valid."). Thus, registration without proof of secondary meaning "creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." Lane, 192 F.3d at 345 (citing PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 563 (2d Cir. 1990)). Defendants accordingly bear the burden of rebutting the presumption of a registered mark's protectability by a preponderance of the evidence. Id. Because the Court considers only those facts alleged in the Complaint on a motion to dismiss, this presumption may be rebutted only if the facts alleged themselves rebut the presumption of distinctiveness. See, e.g., Energy Intel. Grp., Inc. v. UBS Fin. Servs., 2009 WL 1490603, at *6 (S.D.N.Y. May 22, 2009) (overcoming the presumption of distinctiveness and protectability because the facts alleged showed the mark was generic, then dismissing the plaintiff's Lanham Act false designation claim accordingly). One way a defendant may do this is by showing the mark is descriptive[2] or generic. See

[2] Courts measure a mark's distinctiveness on a four-category scale developed by Judge Friendly in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976). These categories, "[a]rrayed in an ascending order which roughly reflects their (*fn. cont. next page*)

20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 88 n.8 (2d Cir. 1984); Cf. Juicy Couture, Inc. v. Bella Int'l Ltd., 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013) (defendant failed to rebut the presumption of distinctiveness because of the proliferation and signature nature of the Juicy Couture product). Once a defendant has made such a showing, the Court of Appeals has held "that in the absence of evidence that the Patent and Trademark Office registered the mark because of its secondary meaning . . . registration does not shift the burden of proving a lack of secondary meaning onto the defendant." 20th Century Wear, Inc., 747 F.2d at 88 n. 8 (2d Cir. 1984).

In sum, the registration of a mark prior to the alleged infringing use of the mark without discussion of secondary meaning in the registration application provides a rebuttable presumption that that mark is more than descriptive and entitled to protection. A defendant may rebut this presumption by showing by a preponderance of the evidence, considering only those facts alleged in the complaint (and other judicially noticed documents),

---

(*cont.*) eligibility to trademark status and the degree of protection accorded . . . are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." Id. Generic terms are not entitled to any protection; descriptive terms may be eligible for trademark protection, but only upon proof of "secondary meaning;" "suggestive, fanciful or arbitrary [terms] are entitled to trademark protection without proof of secondary meaning." Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 647 (2d Cir. 1988).

that the mark is only descriptive. If the defendant does so, the non-discussion of secondary meaning in the registration application means the plaintiff retains the burden of sufficiently pleading secondary meaning.

While courts have considered the retroactive application of the presumption of use when a plaintiff files a use-based trademark application, see J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:19 n. 2 (5th ed. 2026) (collecting cases from the Ninth Circuit and noting that registration on the principal register provides a presumption of ownership and use dating back to the filing date of the application), there is a paucity of caselaw addressing whether the presumption of protectability applies retroactively to the period between application and registration of the mark. While few courts in this District have considered the issue, at least one has determined that the presumption of protectability is not retroactive. See IMAF, S.p.A. v. J. C. Penney Co., No. 86-CV-9080 (KMW), 1989 WL 54128, at *3 (S.D.N.Y. May 15, 1989); see also Sly Mag., LLC v. Weider Publications L.L.C., 241 F.R.D. 527, 530 (S.D.N.Y. 2007) ("Plaintiff is unable to allege direct infringement of its registered mark because there can be no liability based on retroactive registration of a trademark."). Finding Judge Wood's reasoning in IMAF persuasive, the Court concludes that the presumption of protectability applies only to trademarks

registered prior to the start of a defendant's allegedly infringing use.

**b. Application**

Considering each of Plaintiffs' relevant marks in turn, the Court finds Juneja has plausibly alleged protectability for each.

**i. Juneja Provides Prima Facie Evidence that "ANA Law" is Protectible**

Benefitting greatly from the presumption of protectability conveyed by registration on the Principal Register, Juneja plausibly alleges that her "ANA Law" mark is protectible. Juneja applied to register the "ANA Law" mark on May 30, 2021, and the mark was registered on June 14, 2022. (Dkt. 22-4 at ECF 2.) Defendant's first infringing use alleged in the Complaint was in November of 2022. (See Dkt. 1 ¶ 41). Juneja's "ANA Law" mark was thus registered prior to the first alleged infringing use and accordingly is entitled to the Lanham Act's statutory presumption of validity, protectability, and distinctiveness. See Lane, 192 F.3d at 345; IMAF, 1989 WL 54128, at *3. While the Court recognizes that personal names are generally considered descriptive and are thus only protected if they have acquired distinctiveness through secondary meaning, Abraham Zion Corp. v. Lebow, 761 F.2d 93, 104 (2d Cir. 1985), the facts alleged in the Complaint do not, by themselves, rebut the presumption of distinctiveness created by registration of the "ANA Law" mark. As a result, the burden does

not arise at this stage for Juneja to establish secondary meaning specifically for the "ANA Law" mark. Juneja therefore satisfies trademark infringement's validity and protectability prong.

**ii. Juneja Plausibly Alleges that the "ANA" Mark is Protectible**

Although more tenuous, Juneja satisfies her pleading stage burden of plausibly alleging the protectability of her "ANA" mark. Juneja's "ANA" mark was not registered until October 17, 2023 (Dkt. 1 at ECF 9)—nearly a year after Defendant's first alleged infringing use. (Id. ¶ 41.) Accordingly, Juneja's "ANA" mark is not entitled to the rebuttable presumption of validity and protectability provided by the Lanham Act, notwithstanding the fact that Juneja applied to register "ANA" on June 19, 2022 (Dkt. 1-1 at ECF 2.) IMAF, 1989 WL 54128, at *3. Because common personal names like "Ana" are generally considered descriptive, see Abraham Zion, 761 F.2d at 104, Juneja bears the burden of alleging secondary meaning in the "ANA" mark. See Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 647-48 (2d Cir. 1988).

To determine whether a mark has acquired secondary meaning, the "crucial question" is whether the public is at all moved to buy the item at issue because of its source. Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 226 (2d Cir. 2012) (citation omitted). In some cases, it is not the general public's opinion which matters but only the opinion of

that segment of consumers likely to consume the products at issue. Id. at 226 n.23. The six factors generally used to determine secondary meaning are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and[] (6) length and exclusivity of the mark's use." Id. at 226 (citation omitted). Secondary meaning is an "inherently factual inquiry," Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 993 (2d Cir. 1987), and no one factor is dispositive, A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 212 (S.D.N.Y. 2015). This fact-bound nature of the secondary meaning inquiry makes it generally ill-suited for evaluation on a motion to dismiss. See id. at 213 (citation omitted). A court may therefore only determine secondary meaning as a matter of law where the record contains sufficient undisputed facts to resolve the matter. Christian Louboutin, 696 F.3d at 226. However, courts in this District generally decide secondary meaning as a matter of law only at summary judgment, rather than on a motion to dismiss. See Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 348 (S.D.N.Y. 2014) (collecting cases).

Juneja does not allege any facts relevant to the first two factors. Juneja provides some evidence of media coverage as to the third factor. However, one of the articles discussing Juneja's firm explicitly states that it is a paid press release, (Dkt. 1-4

at ECF 28), and the two non-paid articles appear to discuss Juneja's practice of running both a law firm and a social media business concurrently and how such a practice interacts with conventions surrounding attorneys' professional conduct rules. (See id. at ECF 33, 37.) These articles thus say little about whether consumers of legal services are moved to purchase services from Juneja because of the "ANA" mark's purported function as a source identifier. The Complaint makes a better showing on the sales success factor, alleging that "Ms. Juneja has overseen or contributed to more than 8,000 trademark and patent filings over 190 countries," (Dkt. 1 ¶ 17), and "Ana Law LLC serves clients across the United States . . . and abroad." (Id.) The Court is more skeptical on the fifth factor. Juneja alleges that Defendant has knowingly misappropriated her "ANA Law" mark. (See id. ¶ 50.) But it strains credulity to think that Defendant attempted to plagiarize a mark ("ANA") for which, as Juneja concedes, Defendant has had a trademark registration since 2006, and with which Defendant first claimed use in 1911. (Id. ¶ 47; Dkt. 1-5 at ECF 2.) Finally, Juneja claims a first use of the "ANA" mark in commerce in April 2018-four years before Defendant's first alleged infringing use. (Dkt. 1-1 at ECF 2.) Four years of alleged commercial use has been sufficient to establish secondary meaning in several cases in this district. See Kaplan, 16 F. Supp. 3d at 349 (S.D.N.Y. 2014) (collecting cases).

After considering each of the fact-intensive secondary meaning factors, the Court finds Juneja has made at least some showing (though those showings vary considerably in strength) on four of the six secondary meaning factors. Therefore, mindful of the fact-bound nature of the secondary meaning inquiry, courts' reticence to decide secondary meaning on a motion to dismiss, and the Court's duty to draw all reasonable inferences in Plaintiffs' favor, the Court finds Juneja has plausibly alleged secondary meaning in her "ANA" mark. Juneja accordingly satisfies her burden of pleading that her "ANA" mark is protectible.

**4. Likelihood of Confusion**

The Court next determines whether Juneja has plausibly alleged a likelihood of confusion with respect to the marks—she has.

**a. Applicable Law**

To determine the likelihood of confusion, courts in this circuit assess the eight factors identified in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.1961). Those factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective

> quality of the products; and (8) sophistication of consumers in the relevant market.

Id. at 495; Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384–88 (2d Cir. 2005).

This “analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.” Id. Courts in this District are reticent to evaluate dispositively the Polaroid factors on a motion to dismiss due to the factors’ fact-bound nature, see Hermes Int'l, 603 F. Supp. 3d at 106 (“Applying the Polaroid factors is fact-intensive, and resolving the likelihood of confusion on a motion to dismiss posture is not appropriate.), and thus will generally only dismiss trademark infringement claims as a matter of law on a motion to dismiss when the dissimilarities between the marks leaves no question of fact to be decided, see, e.g., Lopez v. Nike, Inc., No. 20—CV—905 (PGG JLC), 2021 WL 128574, at *7 (S.D.N.Y. Jan. 14, 2021), report and recommendation adopted, No. 20-CV—905 (PGG JLC), 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021) (citing Lopez v. Adidas Am., Inc., 19-cv-7631 (LJL), 2020 WL 2539116, at *6 (S.D.N.Y May 19, 2020)).

**b. Application**

Mindful of the Polaroid factors’ fact-bound nature, see Hermes Int'l, 603 F. Supp. 3d at 106, the Court concludes that Juneja has satisfied her burden of plausibly alleging a likelihood

of confusion. In particular, the Complaint contains factual allegations with respect to the similarity of the marks,[3] the proximity of the products and services as issue,[4] actual customer confusion,[5] and bad faith.[6] While these allegations are not clarion proof of a likelihood of confusion, the Court finds that Juneja has pleaded facts sufficient to allege plausibly a likelihood of confusion between her "ANA Law" and "ANA" marks and Defendant's alleged infringing uses. Accordingly, Plaintiffs satisfy the second prong of the trademark infringement analysis.

---

[3] Juneja alleges that Defendant used a hashtag identical to her mark—"#ANALaw"—to promote its legal conferences and events. (Dkt. 1 ¶ 46, 55). Indeed, Juneja uses the same hashtag on social media for her own promotional purposes. (Id. ¶ 55). Juneja also alleges Defendant's verbatim use of "ANA Law" in some of Defendant's more recent legal conferences. (See id. ¶ 45.)

[4] While the parties' uses do not perfectly overlap, Juneja points out that Defendant provides educational services on overlapping topics to a similar national market of attorneys in advertising and marketing law. (See Dkt. 1 ¶ 54.)

[5] While somewhat vague and threadbare, Juneja does allege that some of her clients "have inquired whether she is involved in Defendant's conferences." (Dkt. 1 ¶ 70.) While this allegation falls short of full-throated actual confusion (the customers thought to ask Juneja before assuming her involvement with Defendant's conferences), it does demonstrate some measure of confusion.

[6] Juneja alleges bad faith in Defendant's continuing use of language similar or identical to "ANA Law" after Defendant became aware of Juneja's registration for the mark. (See Dkt. 1 ¶ 61.) While the Court is not convinced that Defendant acted in bad faith based only on the implausibility of Defendant's initial unawareness of Juneja's mark or Defendant's continuing use of allegedly infringing language after communication from Juneja, Juneja's allegations give this factor some weight in her favor at this stage.

### 5. Juneja (Just) Plausibly Alleges the Bad Faith Required for their New York Unfair Competition Claim

In addition to the trademark infringement analysis discussed above, Plaintiffs' unfair competition claim under New York law also requires that the Defendant acted in bad faith. Hermes Int'l, 603 F. Supp. 3d at 102. Juneja has met this burden for the purpose of pleading.

The Court has already briefly discussed how Juneja has pointed to Defendant's constructive awareness of her "ANA Law" mark by virtue of the "ANA Law" registration, Juneja's communications with Defendant, and Defendant's expertise in advertising in marketing law as evidence of Defendant's willful and bad-faith use of Juneja's marks. See supra note 6; (Dkt. 1 ¶ 61.) The Court therefore finds that, after accepting the relevant factual allegations as true and making the "reasonable inference" that Defendant's marketing and branding team would have been aware of Juneja's conflicting use of the marks for the reasons she outlines, Juneja has plausibly alleged that Defendant acted in bad faith.

## C. Plaintiffs' Federal and State Trademark Dilution Claims Fail

Addressing Plaintiffs' trademark dilution claims in turn, neither withstands scrutiny.

**1. Juneja Fails to Allege Plausibly the Fame Required for Federal Trademark Dilution**

Plaintiffs' federal trademark dilution claim comes up short before it gets going: the Complaint fails to allege fame of the kind required for federal trademark dilution.

**a. Applicable Law**

To state a claim for federal trademark dilution under 15 U.S.C. § 1125(c), a plaintiff must allege that "(1) the mark is famous; (2) [the] defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." New York Times Co. v. Microsoft Corp., 777 F. Supp. 3d 283, 323 (S.D.N.Y. 2025) (alteration in original) (citation omitted).

To be famous under the Lanham Act, the mark must be "widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). Fame is the "key ingredient" in federal dilution claims because it is the sternest gatekeeper of the "vast protections" afforded by the federal trademark dilution statute. Savin Corp. v. Savin Grp., 391 F.3d 439, 449 (2d Cir. 2004). Section 1125(c) provides four factors a court may, but need not, consider when determining fame: (1) the duration, extent, and geographic reach of the mark's advertising and publicity, (2) the volume and geographic extent of sales under the mark, (3) the

extent of actual recognition of the mark, and (4) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A).

Based on these factors, courts have uniformly rejected claims of fame unless a mark is truly a household name like "Nike," See Luv N' Care, Ltd. v. Regent Baby Prods. Corp., 841 F. Supp. 2d 753, 757 (S.D.N.Y. 2012) (collecting cases), "Hot Wheels," id., "Dupont, Buick, [or] Kodak." TCPIP Holding Co. v. Haar Commc'ns, Inc., 244 F.3d 88, 96 (2d Cir. 2001). Mere "niche fame" within a particular industry has been expressly excised from consideration under Section 1125(c) and will not suffice. Walker Wear LLC v. Off-White LLC, 624 F. Supp. 3d 424, 430 (S.D.N.Y. 2022) (citing Luv N' Care, 841 F. Supp. 2d at 757-58); see also DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 557-58 (S.D.N.Y. 2018) (further discussing the Trademark Dilution Revision Act of 2006's restriction of fame to exclude niche fame). Failure to allege any fame beyond "niche fame" is fatal to a plaintiff's § 1125(c) claim. DigitAlb, 284 F. Supp. 3d at 558.

**b. Application**

A "Nike" or "Hot Wheels" Plaintiffs' marks are not. Plaintiffs' complaint fails to allege that the marks at issue are famous beyond conclusory restatements of the elements. Juneja argues her marks are famous because they have been featured in "national media" and recognized by various attorney rankings (Dkt. 1 ¶ 38, but national media coverage, even at a level far exceeding

that alleged in the Complaint, has been found to be insufficient for such pleading purposes. See Walker Wear LLC v. Off-White LLC, 624 F. Supp. 3d 424, 430 (S.D.N.Y. 2022) (citing Bd. Of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd., 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008)).

Juneja further argues, relying on Judge Stein's finding that fame was plausibly alleged in In re OpenAI, Inc. Copyright Infringement Litigation, No. 25-CV-4315, 2025 WL 3635559, at *8 (S.D.N.Y. Dec. 15, 2025), that her "social media following numbering in the hundreds of thousands, with over 10 million cumulative video views" demonstrates the marks' fame. (Dkt. 25 at ECF 27). However, Juneja's alleged following is simply of a different (and smaller) order of magnitude than that found sufficient at the pleading stage in OpenAI—the OpenAI plaintiff reported 22.7 million social media followers (approximately seventy-five times Ms. Juneja's alleged follower count[7]) and 12.9 million unique monthly visitors (more visits in a month than Plaintiffs' alleged lifetime cumulative views). Indeed, Judge

[7] That the follower count Ms. Juneja provides comes from November 2025 (when the Complaint was filed) instead of November 2022 (when the alleged dilution began) casts further doubt on the alleged follower and view counts' usefulness as a measure of fame. See Dkt. 1-4 at ECF 2-10.) Defendant's point that Ms. Juneja improperly conflates her personal fame with that of her business, (see Dkt. 28 at ECF 10 (citing Walker Wear, 624 F. Supp. 3d at 428, 430-31)), is also well-taken and further militates against a finding that Plaintiffs have plausibly alleged fame.

Stein found that the complaint in OpenAI contained insufficient allegations of fame for the other brands at issue, despite those brands' affiliated publications having millions of social media followers in their own rights. In re OpenAI, 2025 WL 3635559, at *8.

The Complaint's recitation that Ms. Juneja has engaged in "global client work spanning over 190 countries and 8,000+ trademark and patent matters, as well as nationwide legal education through viral videos, CLE programming, podcasts, and more" is no more helpful to Juneja's fame allegations. (Dkt. 1 at ¶ 38.) First, Section 1125(c) is concerned only with recognition by the "general consuming public of the United States," not consumers in the other 189 countries Ms. Juneja purports to practice in. 15 U.S.C. § 1125(c)(2)(A). And, regardless, the 8,000 matters alleged is far below other sales amounts found to be insufficient to support a finding of fame by other courts. See, e.g., Schutte Bagclosures Inc. v. Kwik Lok Corp., 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) (finding that a figure of five to six billion sales was not sufficient on its own to demonstrate fame); TCPIP Holding Co., 244 F.3d at 99 (finding annual sales of $280 million insufficient to demonstrate fame, absent other showings like truly extensive national media accounts or consumer surveys).

A brief review of the permissive Section 1125(c) statutory factors for fame confirms the deficiency of Plaintiffs' pleadings

as to fame. Juneja's failure to plead any information concerning her advertising expenditures or allege public recognition in any non-conclusory manner dooms her on the first factor. See Walker Wear, 624 F. Supp. 3d at 430-31 (synthesizing other cases' consideration of this factor). The second factor is no more helpful to Plaintiffs. As discussed above, the alleged volume and geographic scope of Plaintiffs' sales under the marks are far below sales amounts other courts have found insufficient to support a finding of fame. The third factor—the extent of actual recognition of the mark—is concerned not with the renown of the business or product using the mark, but rather the mark itself. See Luv N' Care, 841 F. Supp. 2d at 757 (disregarding allegations regarding the renown of a product that "lack[ed] factual references to the trademarks and trade dress in suit"). The Complaint's allegations regarding recognition by media and podcasts of Ms. Juneja, (see Dkt. 1 ¶ 38), do not bend the third factor to support Plaintiffs. Accordingly, notwithstanding the marks' registration, the factors as a whole counsel against the marks' fame.

Simply put, Ms. Juneja fails to allege plausibly that the "ANA" and "ANA Law" marks are the kinds of household names protected by Section 1125(c). She therefore fails to state a claim for trademark dilution under Section 1125(c).

**2. Juneja's New York Law Trademark Dilution Claim is Preempted by the Lanham Act**

Although New York GBL § 360-l provides a somewhat different (and more permissive) standard for trademark dilution, Juneja may not take advantage of it here because her claim is barred by the Lanham Act.

15 U.S.C. § 1125(c)(6) provides that registration on the principal register "shall be a complete bar to an action against [the mark holder], with respect to that mark . . . brought by another person under the common law or a statute of a State."

Plaintiffs' claims arise out of Defendant's use of "ANA" (for which Defendant has a registration) in conjunction with other textual elements in phrases like "#ANALaw" or "ANA Masters of Advertising Law." (See Dkt. 25 at ECF 28.) While there is a paucity of caselaw discussing the extent of Section 1125(c)(6)'s preemption,[8] the only other district court, as far as this Court is aware, to consider whether Section 1125(c)(6)'s statutory bar applies to a defendant's use of other word marks that are similar, but not identical, to a defendant's registered word mark concluded

---

[8] The caselaw Juneja cites in opposition to the application of Section 1125(c)(6)'s statutory bar is inapposite. In Exxon Mobil Corp. v. FX Networks, LLC, 39 F. Supp. 3d 868, 872 (S.D. Tex. 2014), the court concluded "that the phrase 'that mark' [in § 1125(c)(6)] does not encompass unregistered stylized variations of a registered standard character mark"—in other words, a logo (emphasis added).

that the Section 1125(c)(6) bar applied. See Sadhu Singh Hamdard Tr. v. Ajit Newspaper Advert., Mktg. & Communs., 2007 U.S. Dist. LEXIS 114052, at *6-9, *17 n.9 (E.D.N.Y. Mar. 30, 2007) [hereinafter "Ajit Newspaper"] (determining that a plaintiff must be bringing a claim under a trademark infringement theory because a trademark dilution claim would be barred by Section 1125(c)(6) when the defendant had a federal registration for the wordmark "The Ajit" but the alleged infringing use was "Ajit Weekly").[9] Such a result accords with the plain meaning of the text of Section 1125(c)(6) where, as here, the similar unregistered word marks at issue ("#ANA Law," "ANA Masters of Advertising Law," and so forth) contain Defendant's registered mark ("ANA") in its entirely. The Court thus concludes that Plaintiffs' state law trademark dilution claim is barred by the statutory bar contained in 15 U.S.C. § 1125(c)(6).

---

[9] Ajit Newspaper did not hold that Section 1125(c)(6) bars state law dilution claims instead of federal dilution claims. See Ajit Newspaper, 2007 U.S. Dist. LEXIS 114052, at *17 n.9. Instead that court dismissed the plaintiff's New York law trademark dilution claims on other grounds. See id. at *47. Nevertheless, that court's reasoning as to when to apply the Section 1125(c)(6) bar remains sound.

### D. Plaintiffs' Federal False Advertising Claim Fails Because Defendant's App Statement is Mere Puffery

Plaintiffs' remaining claim—for false advertising under the Lanham Act—falls flat because Defendant's statement at issue is entirely non-actionable.

The Lanham Act provides a cause of action against "[a]ny person who . . . uses in commerce any word, . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). False advertising plaintiffs may pursue a theory either of literal or implied falsehood. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). In either case, however, statements that are mere puffery are not actionable under the Lanham Act. Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995). Statements are puffery when they are "[s]ubjective claims about products[] which cannot be proven either true or false." Id. (citation omitted). Puffery may also be understood as "an exaggeration or overstatement expressed in broad, vague, and commendatory language." Time Warner, 497 F.3d at 159 (quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993)). "Whether a statement is puffery is a legal question that may be

determined from the allegations in the complaint." Doe v. Uber Techs., Inc., 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) (citing Geffner v. Coca-Cola Co., 928 F.3d 198, 200 (2d Cir. 2019)).

Defendant's claim at issue—that the App is "[t]he leading AI-powered event app" (Dkt. 1 ¶ 73)—is classic puffery. The word "leading" is incredibly broad and vague and a classic example of commendatory language upon which a reader could not reasonably be expected to rely. See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc., 412 F. Supp. 3d 206, 221, 226 (E.D.N.Y. 2019) (holding that a defendant's claim to be a "leading retailer of premium sneakers" was "plainly puffery"). Doe, upon which Plaintiffs heavily rely, lends further credence to this conclusion, synthesizing relevant Second Circuit caselaw to explain that puffery only ventures into actionable falsehood when the statement made concerns an actual, measurable quantity and a verifiable claim about said quantity. See 551 F. Supp. 3d at 367. The phrase "leading AI-powered[10] event app" is so vague that it

---

[10] In the Complaint, Juneja cites various purported statements by the FTC warning the public they might face legal exposure for making unsubstantiated AI claims, seeking to argue that statement is not puffery. (Dkt. 1 ¶ 75). However, the Court was unable to access either of the sources and notes that Juneja's citation to the Federal Register leads not to an FTC policy statement regarding AI, but rather to an EPA Proposed Rule concerning emissions standards. See 88 Fed. Reg. 22846. Indeed, after a more extensive search, the Court was unable to locate any such policy statement by the FTC in the Federal Register at all. The Court reminds (*fn. cont. next page*)

lacks any quantity to measure: "leading" could mean "most helpful," or "best-reviewed," or "most used," or any one of innumerable other things. The Court therefore holds that Defendant's statement about the App is non-actionable puffery as a matter of law. Accordingly, Plaintiffs fail to state a claim for false advertising.

**E. Motion to Strike**

Finally, the Court addresses whether Plaintiffs' allegations regarding alleged copyright infringement by Defendant should be stricken from the Complaint.

A court may exercise its discretion to strike "any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). However, "courts should not tamper with the pleadings unless there is a strong reason for doing so." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976). On a motion to strike, the defendant bears the burden of showing "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." Roe v. City of New York, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (citation omitted).

---

(*cont.*) Counsel of their duty to thoroughly cite check their work and expects Counsel will ensure no more errors of this kind appear in their briefing moving forward.

While Plaintiffs' offered rationales for how the copyright allegations bear on the issues in this case are highly tenuous, not all are entirely meritless. In particular, Juneja argues that the copyright claims are probative of possible loss of control over reputation and being associated with alleged intellectual property infringement, as an intellectual property attorney and social media personality, can hardly be a boon to Ms. Juneja's reputation (notwithstanding the fact that Ms. Juneja is the one alleging infringement). See NYP Holdings, Inc. v. N.Y. Post Publ'g Inc., 63 F. Supp. 3d 328, 341-42 (S.D.N.Y. 2014) (finding a defendant's past criminal behavior probative of irreparable injury in the context of trademark infringement). Juneja also argues that Defendant's alleged past wrongdoing can be probative as to the "quality of the products" prong of the Polaroid analysis. This is similarly not impossible, given that Ms. Juneja positions herself as an advocate for individuals' intellectual property rights. See Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc., 679 F. Supp. 2d 259, 290 (N.D.N.Y. 2009) (finding illegal activity reported near defendant motorcycle club's premises probative as to the "quality of the products" Polaroid factor when the plaintiff—also a motorcycle club—was comprised entirely of law enforcement officers).

The Court therefore finds Defendant has not met its burden on its Motion to Strike.

## IV. CONCLUSION

For the reasons set forth above:

- With respect to Plaintiffs' (federal and state) trademark infringement, (federal and state) unfair competition, and false designation of origin claims, Defendant's Motion to Dismiss is DENIED as to Plaintiffs' "ANA" and "ANA Law" marks but GRANTED as to all of Plaintiffs' other marks.
- Defendant's Motion to Dismiss is GRANTED with respect to Plaintiffs' federal trademark dilution claim.
- Defendant's Motion to Dismiss is GRANTED with respect to Plaintiffs' New York state law trademark dilution claim.
- Defendant's Motion to Dismiss is GRANTED with respect to Plaintiffs' federal false advertising claim.
- Defendant's Motion to Strike is DENIED without prejudice.

The parties shall confer and inform the Court by joint letter how they propose to proceed within two weeks of the date of this Opinion and Order. The Clerk of Court shall close docket number 20. **SO ORDERED.**

Dated: New York, New York
September 28, 2026

Loretta A. Preska

LORETTA A. PRESKA
Senior United States District Judge